**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EISAI INC.,<br>100 Tice Boulevard<br>Woodcliff Lake, NJ 07677,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993,<br><br>MARGARET HAMBURG, in her official<br>capacity as Commissioner, United States Food<br>and Drug Administration,<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993,<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue<br>Washington, DC 20201,<br><br>SYLVIA MATHEWS BURWELL, in her<br>official capacity as Secretary, United States<br>Department of Health and Human Services,<br>200 Independence Avenue<br>Washington, DC 20201,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br><br>　　Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**PRELIMINARY STATEMENT**

1.　　　To encourage innovation of, and the public's access to, new medicines, Congress

has provided that a drug with an active ingredient not previously approved in the United States

(called a New Chemical Entity, or NCE) is entitled to five years of market exclusivity.  During

this valuable exclusivity period, applications for generic versions of the NCE generally cannot be submitted for United States Food and Drug Administration (FDA) approval.

2.      Often exclusivity is triggered on the date FDA issues a letter announcing the approval of the drug (the "approval letter").

3.      But the date of FDA's approval letter is not always the date market exclusivity is triggered.  For example, if further labeling is required before the drug can be legally marketed (referring hereafter to the ability of the drug to be introduced into interstate commerce), the date the drug can be legally marketed is the date that triggers exclusivity.

4.      FDA has indeed exercised its authority to assign the exclusivity-trigger date to the date the drug could be marketed rather than the date of the agency's approval letter.  In fact, FDA has provided Eisai, Inc. (Eisai) with an example of such a precedent.  Specifically, FDA pointed Eisai to the fact that for the drug RAZADYNE®ER, the agency retroactively moved the date triggering the drug's exclusivity period from the approval letter date to the date the drug could be marketed.

5.      A *market exclusivity* trigger date tied to the ability to actually *market* the drug is logical and in accordance with the law and clear congressional intent; it ensures that—in the case of an NCE—the drug will receive a full five years of market exclusivity.

6.      In this case, however, FDA erroneously triggered the five-year market exclusivity periods for two of Eisai's NCEs—BELVIQ® and FYCOMPA®—long before required labeling allowed Eisai to legally market the products.  That was arbitrary, capricious, and contrary to law. If this Court does not overturn FDA's unlawful acts, BELVIQ® will lose almost one year, and FYCOMPA® will lose *more* than one year, of their respective five-year market exclusivity periods.

7.     Under the Controlled Substances Act (CSA), drugs with abuse potential such as lorcaserin (BELVIQ®) and perampanel (FYCOMPA®) are scheduled and regulated as controlled substances.  The scheduling of controlled substances is a coordinated effort involving FDA, the United States Department of Health and Human Services (HHS), and the United States Drug Enforcement Administration (DEA).  And in accordance with FDA requirements, BELVIQ® and FYCOMPA® could not be legally marketed until DEA finalized the schedules for the drugs under the CSA and labeling incorporated the scheduling information.

8.     The CSA scheduling process and the dates Eisai could begin to legally market its products were outside of Eisai's control.  But FDA erroneously triggered BELVIQ® and FYCOMPA®'s five-year market exclusivity periods long before either drug could be legally marketed.

9.     Further, while BELVIQ® and FYCOMPA® will be deprived of their full five-year market exclusivity periods, sponsors of NCEs that do *not* require CSA scheduling continually enjoy full five-year market exclusivity periods.  FDA's actions have also resulted in disparate treatment of similarly situated NCEs that require CSA scheduling.  FDA has also provided no reasonable basis for treating BELVIQ® and FYCOMPA® differently than RAZADYNE® ER, the agency's prior precedent for changing the exclusivity-trigger date from the date of the approval letter to the date the drug could be marketed.

10.     Defendants' actions violate the Federal Food, Drug, and Cosmetic Act (FDCA), its implementing regulations, and the Administrative Procedure Act (APA).  Eisai seeks declaratory and injunctive relief to remedy Defendants' unlawful acts and to obtain for BELVIQ® and FYCOMPA® the full five-year market exclusivity period to which each product is statutorily entitled.

**PARTIES**

11.     Plaintiff Eisai Inc. is a U.S. corporation headquartered in New Jersey.  Eisai is the owner of New Drug Applications (NDAs) for BELVIQ®, an innovative weight management drug, and FYCOMPA®, the first and only FDA-approved drug of its type for the treatment of a particular type of seizure suffered by epilepsy patients.

12.     Defendant FDA is an agency of the HHS.  FDA has the delegated responsibility to approve and regulate drugs sold within the United States.  FDA's headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver Spring, Maryland 20903.  Its governmental activities occur in this District and nationwide.

13.     Defendant Margaret Hamburg is the Commissioner of FDA and is sued solely in her official capacity.  Congress has charged FDA and the Commissioner with implementing relevant portions of the FDCA and the CSA.  Her governmental activities occur in this District and nationwide.

14.     Defendant HHS is a cabinet department of the United States government.  Its headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, District of Columbia 20201.  Its governmental activities occur in this District and nationwide.

15.     Defendant Sylvia Mathews Burwell is the Secretary of HHS and is sued solely in her official capacity.  Congress has charged HHS and the Secretary with implementing relevant portions of the FDCA and the CSA.  Her governmental activities occur in this District and nationwide.

4

## JURISDICTION AND VENUE

16.     This action arises under the APA, 5 U.S.C. §§ 701-706; the FDCA, in particular 21 U.S.C. § 355; the CSA, in particular 21 U.S.C. § 811; and the FDCA and CSA's implementing regulations, in particular 21 C.F.R. Parts 10, 201, 314, and 1302.

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under federal law.

18.     This Court may issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

19.     There exists an actual and justiciable controversy between Eisai and Defendants requiring resolution by this Court.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because a defendant resides in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

## BACKGROUND

### FDA's Approval of New Drug Applications Under the FDCA

21.     Under the FDCA, a new drug may be legally marketed only after its approval by FDA has become effective.  *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.").

22.     To obtain approval, the sponsor of a new drug that is not a generic drug must submit a New Drug Application, or NDA.  21 U.S.C. § 355(b); 21 C.F.R. § 314.50.  FDA requires, as a precondition for its review, that an NDA contain a completed and signed Form FDA 356h.  21 C.F.R. §§ 314.50 and 314.101(d); *see also* Revised Form FDA 356h, Application

to Market a New Drug, Biologic, or an Antibiotic Drug for Human Use, 62 Fed. Reg. 36,558, 36,560 (July 8, 1997) ("Applicants submitting an NDA . . . will be required to use the new Form FDA 356h beginning January 8, 1998.").

23.    The Form FDA 356h states: "If this application applies to a drug product that FDA has proposed for scheduling under the [CSA], I agree not to market the product until the [DEA] makes a final scheduling decision."

24.    Failure to abide by the terms of the Form FDA 356h could result in severe criminal penalties.  The Form FDA 356h states: "**Warning:**  A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001."  Thus, it is possible that the government could subject a sponsor to prosecution if a sponsor signed the form and then launched the product into interstate commerce before DEA made its final CSA scheduling decision.

25.    FDA will refuse to file the NDA if the sponsor does not submit a signed Form FDA 356h, which includes the certification prohibiting marketing until CSA scheduling is complete.  21 C.F.R. § 314.101(d)(1).

**Five-Year Market Exclusivity for New Chemical Entities**

26.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman Act," which amended the FDCA to put in place incentives designed to expedite approval of affordable generic drugs without undermining the development of innovative drugs.

27.    The Hatch-Waxman Act was enacted as a compromise between the competing interests of promoting innovation and fostering generic competition in the pharmaceutical industry.  The Hatch-Waxman Act both promotes market entry of generic versions of approved new drugs while maintaining incentives for innovators.  *See generally Actavis Elizabeth LLC v.*

*FDA*, 625 F.3d 760, 765 (D.C. Cir. 2010) (recognizing that the exclusivity provisions "struck a balance between expediting generic drug applications and protecting the interests of the original drug manufacturers").

28.     The Hatch-Waxman Act made it significantly easier for generic drugs to receive FDA approval.   But Congress recognized that developers of *new* drug substances invest substantial sums on research and development, with no guarantee that their efforts will bear fruit. Indeed, the development of NCEs is resource intensive and fraught with failure.   Drugs such as BELVIQ® and FYCOMPA® are demonstrated safe and effective through substantial clinical trials.   Few developmental drugs ever make it to the market, and it has been estimated that it takes about twelve years and more than $800 million to $1 billion to bring a new drug to market. The Hatch-Waxman Act accordingly amended the FDCA to grant successful developers of certain new drug substances a limited period of protection from generic competition.

29.     One of the ways Congress mandated that protection was in the form of a five-year market exclusivity period for an NCE.   *See* 21 U.S.C. §§ 355(c)(3)(E) and (j)(5)(F); *see also* 130 Cong. Rec. H9114 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman) ("[T]he amendment provides a *5-year period of exclusive market life* for drugs approved for the first time after enactment of this legislation.   This provision will give the drug industry the incentives needed to develop new chemical entities . . . .") (emphasis added).   During that five-year exclusivity period, generic drug sponsors are generally precluded from seeking FDA approval through the abbreviated procedures ordinarily available for generic versions of approved new drug products.

30.     The five-year market exclusivity period for NCEs is a pillar in the balance struck by the Hatch-Waxman Act.   Erosion of, or loss of confidence in, the five-year market exclusivity period would significantly impair this delicate balance.   Market exclusivity provides a critical

incentive for drug development—and advances FDA's goal of protecting and promoting public health.  Depriving an NCE of its full five-year market exclusivity period would stifle rather than encourage innovation, all to the public's detriment.

**DEA's Scheduling of FDA-Approved Drugs Under the CSA**

31.     When it appears to FDA that an NDA involves a drug that has "abuse potential," 21 U.S.C. § 811, the CSA requires the Secretary to so notify DEA.  FDA then analyzes the data regarding the drug's potential for abuse and prepares a recommendation, which is forwarded by HHS to DEA, as to how the drug should be scheduled.

32.     After analyzing HHS's recommendation and assessing the NCE's abuse potential, DEA begins notice-and-comment rulemaking for the drug's scheduling.  Once DEA has reviewed comments to its proposed rule scheduling the drug, it publishes a notice in the Federal Register finalizing the scheduling of the drug and setting the effective date for its scheduling action.  The final scheduling information must then be incorporated into the drug's labeling before it can be legally marketed.  21 C.F.R. § 1302.04.

**BELVIQ®**

33.     Eisai holds the NDA (NDA 022529) for BELVIQ®.

34.     BELVIQ® is an NCE and is statutorily entitled to a five-year period of market exclusivity.

35.     Obesity is the third leading cause of preventable death, and obesity-related medical care is projected to increase annual health-care costs in the U.S. by $28 billion per year through 2020.  Nine percent of all health-care spending in the U.S. is for the treatment of obesity and obesity-related diseases.

36.     BELVIQ® is an innovative weight-management treatment designed to treat the disease of obesity and the first drug in over thirteen years deemed safe and effective for that purpose by FDA.  Development of BELVIQ® took fourteen years and cost over $300 million.  Eisai has a marketing and supply agreement with Arena Pharmaceuticals GmbH (Arena) for BELVIQ® and has worked with Arena during the NDA review and approval process.  Under the agreement with Arena, Eisai is responsible for the marketing and distribution of BELVIQ® in the United States.  Arena identified BELVIQ® (lorcaserin hydrochloride) in a research project during which over a thousand novel chemical compounds were synthesized and subsequently subjected to a serotonin receptor agonist screening program.  After selection of lorcaserin for further development, Arena commenced Phase I clinical testing in 2004.  Five years passed before completion of Phase III clinical testing, allowing Arena to begin the FDA approval process.

37.     FDA issued a letter approving BELVIQ® as safe and effective on June 27, 2012, and restated FDA's prohibition against Eisai legally marketing BELVIQ® until DEA "made a final scheduling decision" and BELVIQ®'s labeling was revised to include the drug's scheduling information.

38.     After issuing the letter, FDA included BELVIQ® in its publication *Approved Drug Products With Therapeutic Equivalence Evaluations*, commonly known as "the *Orange Book*."  In so doing, FDA acknowledged that final agency action had been taken regarding the start of BELVIQ®'s five-year market exclusivity; the agency determined that the market exclusivity period began on June 27, 2012.

39.     Although FDA issued the letter approving BELVIQ® as safe and effective on June 27, 2012, HHS had only provided DEA with a scheduling recommendation for BELVIQ® just two days prior, on June 25, 2012.

40.     DEA's notice-and-comment rulemaking process to schedule BELVIQ® then did not begin until six months later, culminating with the finalization of BELVIQ®'s scheduling as a Schedule IV drug under the CSA effective June 7, 2013—nearly a year after BELVIQ®'s market exclusivity period had commenced.  *See* 78 Fed. Reg. 26,701 (May 8, 2013).

41.     When FDA triggered the start of BELVIQ®'s market exclusivity period, as reflected in the *Orange Book*, FDA effectively reduced the duration of exclusivity to less than five years.  That action stripped Eisai of a valuable statutory right critical to the balance struck in the Hatch-Waxman Act.  Because Eisai had to wait nearly a year before it could legally market BELVIQ®, Eisai received only about eighty percent of the benefit to which, as a pioneer of a NCE, it was statutorily entitled.

42.     The truncated market exclusivity period requires Eisai to alter its planning for the marketing of BELVIQ®, as Eisai now has nearly a year less protection from generic challenge. Eisai must now shift valuable resources toward addressing the threat of premature generic competition by, among other things, beginning preparation for the possibility of earlier patent litigation involving BELVIQ®.

## FYCOMPA®

43.     Eisai holds the NDA (NDA 202834) for FYCOMPA®.

44.     FYCOMPA® is an NCE and is statutorily entitled to a five-year period of market exclusivity.

45.     Approximately 2.2 million people in the U.S. suffer from epilepsy, a neurological disorder characterized by seizures.  An additional 150,000 cases of the disorder are diagnosed each year.  Epilepsy is associated with a higher than normal mortality rate, which is even higher for those whose seizures are uncontrolled.  Because one-third of patients taking the principal medications for epilepsy have uncontrolled seizures, there remains a significant unmet medical need for effective new treatments that help control the symptoms of this life-threatening disorder.

46.     FYCOMPA® helps fulfill that need.  Eisai developed FYCOMPA® by targeting certain brain receptors—known as "AMPA" receptors—that had never before been targeted by a drug proven safe and effective.  That exhaustive research effort took years and a substantial investment of resources, resulting in 1,410,750 pages of data submitted as part of FYCOMPA®'s FDA-approval process.  The result of that effort is a groundbreaking treatment option for patients suffering from uncontrolled partial-onset seizures—that is, seizures originating in only one part of the brain.  Because of FYCOMPA®'s "unique mechanism of action," FDA has recognized the drug as "First-in-Class" for treating partial-onset seizures.

47.     On October 22, 2012, FDA issued a letter approving FYCOMPA® as safe and effective.  In the letter, FDA restated the Form 356h prohibition against Eisai legally marketing FYCOMPA® until the DEA's scheduling process for the drug was complete and FYCOMPA®'s labeling was revised to include the drug's scheduling information.

48.     After issuing the letter, FDA included FYCOMPA® in the *Orange Book*.  In so doing, FDA acknowledged that final agency action had been taken regarding the start of FYCOMPA®'s five-year market exclusivity; the agency determined that the exclusivity period began on October 22, 2012.

49.     When FDA issued the letter approving FYCOMPA® as safe and effective, however, HHS had not yet provided its scheduling recommendation to DEA.  That happened nearly three months later, around January 28, 2013.   DEA then delayed the start of FYCOMPA®'s scheduling process for *another* nine months, so final scheduling of FYCOMPA® as a Schedule III drug under the CSA did not become effective until January 2, 2014—more than fourteen months into FYCOMPA®'s market exclusivity period.  *See* 78 Fed. Reg. 72,013 (Dec. 2, 2013).

50.     As with BELVIQ®, FDA's action with respect to FYCOMPA®'s market exclusivity period stripped Eisai of a valuable statutory right and reward for innovation, effectively reducing Eisai's protection from a generic challenge to three-quarters of the term provided for by Congress.  Eisai has thus altered its planning for the marketing of FYCOMPA® and must shift valuable resources toward addressing the threat of premature generic competition.

**BELVIQ® and FYCOMPA®'s Five-Year Market Exclusivity Periods Should Have Been Triggered Only When the Products Were Able to be Legally Marketed (When CSA Scheduling was Finalized and Labeling Incorporated the CSA Scheduling Information).**

51.     Under the FDCA, when an NCE is entitled to five-year market exclusivity, a generic drug application may not be submitted to FDA "before the expiration of five years from the date of the approval of the [NCE] application."[1] 21 U.S.C. §§ 355(c)(3)(E) and (j)(5)(F).

52.     FDA regulation 21 C.F.R. § 314.108(a) specifically defines the trigger date—the "date of approval"—for the start of the exclusivity period as:

> the date on the letter from FDA stating that the new drug application is approved, whether or not final printed labeling or other materials must yet be submitted *as long as approval of such labeling or materials is not expressly required*.  "Date of approval"

---

[1] A generic application may be submitted after the expiration of four years from the date of the approval if it contains a certification of patent invalidity or noninfringement.  *See* 21 U.S.C. §§ 355(c)(3)(E) and (j)(5)(F).

> refers only to a final approval and not a tentative approval that may
> become effective at a later date.  (Emphasis added.)

53.     As 21 C.F.R. § 314.108(a) makes clear, the date of the approval letter is not always the trigger date for exclusivity.  Rather, the regulation is written to ensure that the exclusivity trigger date is tied to the date that the drug can actually be legally marketed.  For example, if further labeling is required to legally market the drug, the approval letter would not trigger the exclusivity period.  The regulation was specifically written this way to address situations where the ability to legally market an NCE was dependent on DEA final scheduling of the drug under the CSA.  *See* 54 Fed. Reg. 28872, 28898 (July 10, 1989) (Proposed Rule promulgating 21 C.F.R. § 314.108(a)).

54.     This approach makes sense and is consistent with other provisions of the FDCA and FDA regulations.  Specifically, under the FDCA, *effective* "approval" is tied to when the approved drug can be legally marketed in interstate commerce.   The statute states:

> No person shall introduce or deliver for introduction into interstate
> commerce any new drug, unless an approval of [a new drug]
> application . . . *is effective* with respect to such drug.

21 U.S.C. § 355(a) (emphasis added).  The related regulation also expressly ties FDA's effective approval to the ability to commercially market the drug:  21 C.F.R. § 314.105(a) states that "[a] new drug product . . . may not be marketed until an approval is effective."

55.     It is entirely logical that five-year market exclusivity should hinge on when the drug could actually be commercially launched.  It would have been odd indeed if Congress granted an NCE sponsor five years of exclusivity to market the product only to allow FDA to shorten that time frame by hinging the exclusivity period on a trigger *other* than when FDA allows the sponsor to legally market the product.

56.     In the preamble to the final rule promulgating 21 C.F.R. § 314.108(a)—the regulation governing the trigger date for market exclusivity—FDA recognized as much.  It noted that the key to determining when the exclusivity period begins is when the product could be "legally marketed."  FDA wrote:  "labeling or other material that might delay the actual initiation of marketing of the product is not relevant to a determination of the date of approval, *so long as the product could be legally marketed*."  54 Fed. Reg. at 28898 (emphasis added).

57.     Eisai could not legally market BELVIQ® and FYCOMPA® until the products' labeling incorporated final CSA scheduling symbols.  Specifically:

> A.     FDA's Form FDA 356h *expressly required* that Eisai refrain from launching into the marketplace BELVIQ® and FYCOMPA® prior to CSA scheduling.

> B.     Once CSA scheduling was complete, FDA regulations *expressly required* that labeling incorporate the CSA symbol before the products could be legally marketed.  *See* 21 C.F.R. §§ 201.57(a)(2), 201.57(c)(10)(i), and 1302.04.

58.     Additionally, FDA's regulations *expressly require* that FDA approve the labeling with the CSA symbol.  *See* 21 C.F.R. §§ 314.70(b)(2)(v)(C); 201.57(a)(2).

59.     Therefore, consistent with FDA's regulation—21 C.F.R. § 314.108(a)—the governing statute, and clear congressional intent, market exclusivity for BELVIQ® and FYCOMPA® should have been triggered when labeling incorporating the final CSA schedule permitted legal marketing of the products.  FDA's letters approving the products as safe and effective reinforce this requirement.  FDA's letters make clear that the products' labeling would

need further revisions once CSA scheduling was complete.   Indeed, the labeling itself that accompanied FDA's letter for FYCOMPA® states:

> **9.1  Controlled Substance**
>
> FYCOMPA contains perampanel. **(Schedule to be determined after DEA review).**

Thus, after CSA scheduling, a revision to the labeling was expressly required before the product could be legally marketed.   Therefore, the date of the approval letters cannot be considered the triggering date for market exclusivity purposes.

60.     The *expressly required* labeling incorporating BELVIQ®'s CSA symbol permitted the product to be first legally marketed on June 7, 2013. The *expressly required* labeling incorporating FYCOMPA®'s CSA symbol permitted the product to be first legally marketed on January 2, 2014.

61.     BELVIQ® and FYCOMPA®'s five-year market exclusivity periods should have been triggered only when the products were able to be legally marketed (when CSA scheduling was finalized and required labeling incorporated the CSA scheduling information).   FDA's failure to act accordingly is arbitrary, capricious, and contrary to the law, and it deprived each product of its *full* five-year exclusivity period that Congress intended and mandated.

**FDA's Different Treatment of BELVIQ® and FYCOMPA® Compared To Other NCEs and Similarly Situated Products is Arbitrary and Capricious.**

62.     FDA's actions depriving BELVIQ® and FYCOMPA® of full five-year market exclusivity periods are also arbitrary and capricious because FDA is unfairly penalizing Eisai for developing and seeking to commercialize NCEs recommended for CSA scheduling.   While BELVIQ® and FYCOMPA® will be deprived of their full five-year market exclusivity periods, sponsors of NCEs that do not require CSA scheduling enjoy full five-year exclusivity periods.

63.     For example, MYRBETRIQ® (mirabegron), approved on June 28, 2012, and XELJANZ® (tofacitinib), approved on November 6, 2012, were NCEs approved roughly the same time as BELVIQ® and FYCOMPA®, respectively.   In contrast to Eisai's products, however, MYRBETRIQ® and XELJANZ® will enjoy full five-year market exclusivity periods because they were not subject to CSA scheduling.   FDA's disparate treatment of NDAs entitled to five-year market exclusivity—with no explanation and no justification—highlights the arbitrary and capricious nature of FDA's actions with respect to BELVIQ® and FYCOMPA®. *See Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) (disparate treatment of similarly situated products is arbitrary and capricious).

64.     FDA's actions have also resulted in disparate treatment among sponsors of CSA scheduled products themselves.   For example, an examination of NCEs that FDA recommended for scheduling demonstrates that FDA submitted its recommendation to DEA anywhere from 367 days *before* issuing an approval letter (PROVIGIL®) to as many as 94 days *after* issuing an approval letter (LYRICA®).   FDA has offered no explanation and no sound policy rationale for this disparate treatment, even though FDA's wildly varying timeframe for providing DEA with scheduling recommendations can substantially diminish an NCE's five-year market exclusivity period.

65.     For example, FDA submitted its scheduling recommendation for BELVIQ® to DEA two days before issuing a letter approving the drug as safe and effective, and Eisai will now lose nearly one year—345 days—of market exclusivity for BELVIQ®.   On the other hand, the sponsor of PROVIGIL® only lost thirty-four days of market exclusivity due, at least in part, to FDA providing its scheduling recommendation to DEA 367 days before issuing the PROVIGIL®

approval letter.  FDA's determination of the market exclusivity periods for two similarly situated NDA sponsors—resulting in a 313-day disparity—is arbitrary and capricious.

66.     FDA's actions are also arbitrary and capricious because they are contrary to past agency practice.  In the past, FDA has utilized 21 C.F.R. § 314.108(a) to assign the exclusivity-trigger date to the date the drug could be legally marketed rather than the date of the agency's approval letter.

67.     In fact, FDA has provided Eisai with such past agency precedent.  Specifically, FDA pointed Eisai to the fact that for the drug RAZADYNE® ER, the agency retroactively moved the date triggering the drug's exclusivity period from the approval letter date to the date the drug could be marketed.

68.     On December 22, 2004, FDA issued an approval letter for RAZADYNE® ER's NDA 12-615 (for a controlled release formulation of galanamine hydrobromide).  *See* Exhibit A, RAZADYNE® ER Approval Letter.  The approval letter unambiguously stated that the drug was "approved, effective [December 22, 2004], for use as recommended in the attached agreed-upon labeling text."   Id.   Thereafter, the drug's sponsor issued a press release confirming that RAZADYNE® ER was "[a]pproved by the U.S. Food and Drug Administration (FDA) in December 2004."  *See* Exhibit B, Ortho-McNeil Neurologics, Inc. Press Release, May 23, 2005. To this day, FDA's public database of approved drug products still lists RAZADYNE® ER's approval date as December 22, 2004.  *See* Exhibit C, RAZADYNE® ER Approval Date on Drugs@FDA.

69.     On June 13, 2006, long after RAZADYNE® ER was commercially launched, FDA decided to reach back and move the date triggering the drug's exclusivity period to April 1, 2005, because the agency concluded that was the earliest date that RAZADYNE® ER could have

been marketed.  *See* Exhibit D, FDA's June 13, 2006 Letter.  FDA then officially changed the trigger date for RAZADYNE® ER's market exclusivity period from December 22, 2004 to April 1, 2005 in the *Orange Book*.  *Compare* Exhibit E, RAZADYNE® ER's 2007 Orange Book listing, *with* Exhibit F, RAZADYNE® ER's 2006 Orange Book listing.

70.    As the RAZADYNE® ER example makes clear, FDA previously has retroactively moved the date triggering a drug's exclusivity period from the approval letter date to the date the drug could be marketed.  And in the case of RAZADYNE® ER, FDA did so long after the drug was approved and commercially launched.  Despite this clear agency precedent, FDA has refused to take such appropriate actions with regards to BELVIQ® and FYCOMPA®.  And, in doing so, FDA has also failed to provide a reasonable basis for treating BELVIQ® and FYCOMPA® differently.

## FDA's Denial of Eisai's Citizen Petition Was Arbitrary, Capricious, Contrary to Law, and Short of Statutory Right.

71.    To address FDA's incorrect and premature commencement of the market exclusivity periods for BELVIQ® and FYCOMPA®, Eisai filed Citizen Petition No. 2013-P-0884 and supporting documents (the Petition) on July 25, 2013.  *See* Exhibit G, Eisai's July 25, 2013 Petition.

72.    FDA's regulations allow citizens to petition FDA to "issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action."  21 C.F.R. § 10.25.

73.    FDA must rule on each citizen petition filed.  21 C.F.R. § 10.30(e).

74.    FDA's decision on a citizen petition constitutes a final agency action that is reviewable by this Court.  21 C.F.R. § 10.45(d).

75.     The Petition requested that the Commissioner take the following actions, which are at issue in this case:

A.     Determine that the date of approval that starts the five-year exclusivity period for BELVIQ® is June 7, 2013, the date that Eisai could commercially market BELVIQ® in interstate commerce.

B.     Determine that the date of approval that starts the five-year exclusivity period for FYCOMPA® is the date that Eisai can commercially market the product in interstate commerce.[2]

76.     The Petition supported the requested actions by asserting the same factual and legal rationale as described in the above paragraphs.

77.     On April 30, 2014, FDA responded to the Petition.  The agency stated, "FDA understands that [Eisai has] lost valuable marketing time during the 5-year NCE exclusivity period" and "FDA understands the equitable arguments made by [Eisai], and is actively considering whether it should change its approach going forward[.]"  *See* Exhibit H, FDA's April 30, 2014 Denial (the Denial) at 18 and FN 96.  Nevertheless, FDA denied the Petition.

78.     In denying the Petition, FDA ignored its clear statutory mandate from Congress to ensure that products such as BELVIQ® and FYCOMPA® receive *full* five-year market exclusivity periods.  FDA's denial of the Petition erroneously concluded that the five-year market exclusivity periods for BELVIQ® and FYCOMPA® were triggered long before CSA scheduling and required labeling permitted Eisai to legally market the products.  Under FDA's improper denial of the Petition, BELVIQ® will lose almost one year, and FYCOMPA® will lose

---

[2] The date that Eisai could commercially market FYCOMPA® in interstate commerce was January 2, 2014.

more than one year, of their respective five-year market exclusivity periods, to which each product is statutorily entitled.

79. In denying the Petition, FDA also admitted that 21 C.F.R. § 314.108(a) provides both a "general rule" that market exclusivity is triggered on the date of FDA's approval letter and an "exception to the general rule" when exclusivity is not triggered by the approval letter but rather is triggered at a later date (i.e., when further labeling is expressly required). *See* Exhibit H, the Denial at 17 and FN 92. But FDA improperly determined that BELVIQ® and FYCOMPA® do not qualify for the 21 C.F.R. § 314.108(a) "exception." Id at 17. FDA's lone basis for that determination was that "the approval letters for the drugs at issue here do not 'expressly require' approval of labeling or other materials" nor do the letters "even impliedly require such approval." Id. at 17. FDA's decision is improper for a number of reasons, including:

A. The agency erroneously read into the 21 C.F.R. § 314.108(a) "exception" a requirement that the "approval letters for the drugs" must themselves *expressly require* further labeling. There is no such requirement under the clear language of the regulation.

B. The agency ignored the fact that: (1) FDA's Form FDA 356h *expressly required* final CSA scheduling before BELVIQ® and FYCOMPA® could be legally marketed; and (2) that once CSA scheduling was complete, FDA and DEA regulations *expressly required* labeling that incorporated the CSA symbol before the products could be legally marketed, *see* 21 C.F.R. §§ 201.57(a)(2), 201.57(c)(10)(i), and 1302.04.

C.      The agency ignored the fact that FDA regulations also *expressly required* that FDA approve the labeling with the CSA symbol, *see* 21 C.F.R. §§ 314.70(b)(2)(v)(C), 201.57(a)(2).

D.      The agency ignored the fact that both the BELVIQ® and FYCOMPA® approval letters made clear that before the products could be legally marketed the products' labeling would need to incorporate the CSA symbols.

E.      The agency ignored that the 21 C.F.R. § 314.108(a) "exception" is tied to the sponsor's ability to "legally market" the drug, *see* 54 Fed. Reg. at 28898, and failed to consider its own recognition that further labeling, incorporating final CSA scheduling symbols, was *expressly required* for BELVIQ® and FYCOMPA® before they could be legally marketed. As stated above, the labeling that accompanied FDA's letter approving FYCOMPA® as safe and effective included the following CSA scheduling placeholder that had to be revised and approved before the drug could be legally marketed: "FYCOMPA contains perampanel. (**Schedule to be determined after DEA review**)."

80.      Additionally, FDA's decision is improper because the agency's application of the 21 C.F.R. § 314.108(a) "exception" to RAZADYNE® ER is contrary to the very standard FDA applied to BELVIQ® and FYCOMPA®. *See* Exhibit H, the Denial at 17 and FN 92. The RAZADYNE® ER approval letter makes no mention of an express requirement for the "approval of labeling or other materials," with regard to a new trade name or otherwise. *See* Exhibit A, RAZADYNE® ER Approval Letter. Further, a trade name is not required to legally market an

approved drug.  *Cf.* 21 U.S.C. § 352 (requiring an established or non-proprietary name on the label of a drug product but not requiring a proprietary or trade name).  Labeling can merely incorporate the established name of the drug.  Indeed, FDA has in the past concluded that drugs subject to an NDA can be legally marketed without a trade name. *See, e.g.,* Exhibit I, Teva Pharmaceutical Industries Ltd.'s June 16, 2010 Citizen Petition (highlighting FDA's approval of albuterol sulfate, HFA inhalation aerosol drug product for legal marketing without an approved trade name).  In contrast, to legally market drugs like BELVIQ® and FYCOMPA®, labeling must incorporate their respective CSA symbols.  If RAZADYNE® ER meets the 21 C.F.R. § 314.108(a) "exception" standard, clearly so must BELVIQ® and FYCOMPA®.

81.     FDA has completely failed to provide justification for its treatment of BELVIQ® and FYCOMPA® differently than RAZADYNE® ER.

82.     In denying the Petition, FDA also refused to address Eisai's specific arguments raised in the Petition that:

A.     The agency's treatment of BELVIQ® and FYCOMPA® differently than other NCEs is arbitrary and capricious.

B.     The agency's treatment of BELVIQ® and FYCOMPA® differently than other NCEs subject to CSA scheduling is arbitrary and capricious.

83.     In light of the above, FDA's denial of the Petition was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**COUNT ONE**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**FDA's Decision Regarding When the Exclusivity Periods for**
**BELVIQ® and FYCOMPA® Began Is Arbitrary, Capricious, or**
**Otherwise Not in Accordance with Law, and in Excess of Statutory Authority or**
**Limitations, or Short of Statutory Right**

84.     Plaintiff reasserts and incorporates by reference each of the above paragraphs.

85.     As set forth above, FDA's decision regarding when the five-year market exclusivity periods for BELVIQ® and FYCOMPA® were triggered is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A), in excess of statutory authority or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C), and in violation of the FDCA and FDA's implementing regulations.  The APA requires that such agency actions be set aside.

86.     Congress, through the FDCA, provided that NCEs such as BELVIQ® and FYCOMPA® are entitled to a *full* five years of market exclusivity.  *See* 21 U.S.C. §§ 355(c)(3)(E) and (j)(5)(F).  FDA's decision to start BELVIQ®'s five-year market exclusivity period on June 27, 2012, and FYCOMPA®'s five-year market exclusivity period on October 22, 2012—long before either drug could be legally marketed—reduces the congressionally-mandated period of market exclusivity to less than five years, in violation of the FDCA, clear congressional intent, and FDA's implementing regulations.

87.     FDA's decision to start the five-year market exclusivity period for some NCEs before the date the drug can be legally marketed results in market exclusivity periods of arbitrary, capricious, and unlawful duration.   The exclusivity period for BELVIQ®, FYCOMPA®, and other NCEs for which CSA scheduling must still be finalized will vary depending on how long it takes DEA to finalize the scheduling and for required labeling to

incorporate the scheduling information.  Yet NCEs that need not undergo CSA scheduling will receive the full five years of exclusivity to which they are statutorily entitled.

88.     FDA's commencement of BELVIQ®'s five-year market exclusivity on June 27, 2012, and FYCOMPA®'s five-year market exclusivity on October 22, 2012, constitute final agency actions that are reviewable by this Court.  5 U.S.C. § 706.  FDA acknowledged these final agency actions in the *Orange Book*.  Further, FDA's denial of the Petition constitutes a final agency action that is reviewable by this Court.  21 C.F.R. § 10.45(d).

89.     For these reasons, FDA's decision as to when BELVIQ®'s and FYCOMPA®'s market exclusivity periods began should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory authority or limitations, or short of statutory right.

90.     Eisai has no adequate remedy at law and will suffer substantial and irreparable harm in the form of a lost statutory right unless this Court issues declaratory and injunctive relief directing FDA to commence the five-year exclusivity period for BELVIQ® and FYCOMPA® on the date each drug's CSA scheduling was complete and required labeling incorporating the scheduling information allowed the product to be launched into interstate commerce—June 7, 2013 for BELVIQ® and January 2, 2014 for FYCOMPA®.

91.     There exists an actual and substantial controversy between Eisai and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

92.     An order directing FDA to commence the exclusivity period for BELVIQ® on June 7, 2013 and FYCOMPA® on January 2, 2014 would not substantially injure other interested parties, and the public interest will be furthered by granting market exclusivity periods that are

not arbitrary, capricious, or otherwise contrary to law.  The intent of Congress and the public interest will be served by such an order.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests an Order from this Court:

A. Declaring FDA's decision as to BELVIQ®'s and FYCOMPA®'s five-year exclusivity periods arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in excess of statutory authority or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2);

B. Compelling FDA to commence the five-year exclusivity periods for BELVIQ® and FYCOMPA® on the date each drug's CSA scheduling was complete and labeling incorporating the scheduling information allowed the product to be launched into interstate commerce—June 7, 2013 for BELVIQ® and January 2, 2014 for FYCOMPA®; and

C. Awarding any other relief the Court deems just and proper.


Dated: August 8, 2014

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (DC Bar # 453221)
James R. Johnson (DC Bar # 1003740)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: 202-637-5600
Fax: 202-637-5910
cate.stetson@hoganlovells.com

*Counsel for Plaintiff*